FILED
2011 Aug-05  AM 10:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ANTHONY TATE, on behalf of himself and all those similarly situated,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Case No.: 2:08-CV-1935-VEH** |
| | ) |
| **DHL EXPRESS (USA) INC.,** | ) ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the Court is DHL Express (USA) Inc.'s ("DHL") Motion for Summary Judgment (doc. 69), Amended Motion for Summary Judgment (doc. 71), Second Motion for Summary Judgment (doc. 83), and Motion to Strike (doc. 100). For the reasons explained below, DHL's Amended Motion for Summary Judgment is due to be granted and DHL's Motion to Strike is due to be denied. DHL's Motion for Summary Judgment and Second Motion for Summary Judgment are due to be denied as moot.

## II.    STANDARD ON MOTION FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A

---

[1] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to FED. R. CIV. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 258. "If the evidence [presented by the nonmoving party to rebut the moving party's evidence] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249 (internal citations omitted).

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See *Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Id.* at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial. *Id.*

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.*

at 1116.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.  *Id.*

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  *Id.*  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case.  *Id.* at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *Id.* at 1116-17.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   STATEMENT OF FACTS[2]

DHL, the sole defendant, is a delivery service business that provides express delivery and logistics services worldwide through a global network of gateways, hubs, warehouses, and terminals to meet its customers' needs.  AF 1.[3]  Between 2005 and early 2009, DHL negotiated and contracted with Territory Reps, Inc. ("Territory Reps") to provide local pick-up and delivery services operating out of a facility in Birmingham, Alabama.   AF 2.   William D. Coley is the owner and president of Territory Reps.  AF 4.  Coley was responsible for negotiating the terms of Territory Reps' contracts with DHL.  AF 4.

Plaintiffs were employed by Territory Reps as delivery couriers whose

---

[2]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.") (quotation omitted).

[3]  The designation "AF" stands for admitted fact and indicates a fact offered by DHL that Plaintiffs have admitted in their written submissions on summary judgment, in deposition testimony, or by virtue of any other evidence offered in support of their case.  Whenever Plaintiffs have adequately disputed a fact offered by DHL, the court has accepted Plaintiffs' version. The court's numbering of admitted facts (e.g., AF No. 1) corresponds to the numbering of DHL's Statement of Undisputed Material Facts as set forth in Doc. 71 and responded to by Plaintiffs in Doc. 90.  Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Plaintiffs' Statement of Material Facts contained in Doc. 90 and responded to by DHL in Doc. 102.

principal duties were the pick-up and delivery of parcels.  AF 5.  Plaintiffs spent the majority of their day in their delivery vehicles out on their delivery route.  AF 6. Plaintiffs, like other drivers, were required to know how to read English, drive, read a map, organize packages, interact with customers, and operate the leased DHL scanner.  AAF 69.  Operating the leased DHL scanner required that a driver be able to turn it on and off, scan the package bar-code, send a text message, and show the customer where to sign the scanner.  AAF 70.

The business relationship between DHL and Territory Reps was governed by a Cartage Agreement and its accompanying Schedules.  AF 9.  Territory Reps' leasing of real and personal property from DHL was governed by their Administrative Agreements and Leases of Personal Property, respectively.  AF 9.  The Cartage Agreement was a one year agreement terminable at will by either party.  AF 10.  It established the terms and conditions pursuant to which Territory Reps would provide services to DHL.  AF 10.  Under the basic framework of the Cartage Agreement, Territory Reps would provide pick-up and delivery services to DHL in a specifically defined geographic territory.  AF 10.  Whenever necessary, DHL and Territory Reps would renegotiate the terms of certain Schedules.  AF 11.

The first paragraph of the Cartage Agreement expressly states the intention to create an independent contractor relationship between DHL and Territory Reps.  AF

6

12.  Paragraph 5 discusses the relationship between DHL and Territory Reps in detail:

> 5.  <u>Independent Contractor</u>.
>
> 5.1 <u>Independent Contractor Status</u>.  In making and performing this Agreement, the parties are acting, and shall act, as independent contractors.  Neither party is, nor will be deemed to be, an agent, legal representative, joint venturer, franchisor, franchisee, or legal partner of the other party for any purpose. . .
>
> 5.2 <u>Status of Contractor's Employees</u>.  Contractor shall be solely responsible for the interviewing, hiring, training, disciplining, and termination of Contractor Workers and shall in all circumstances make clear to each Contractor Worker that such Contractor Worker is not an employee of DHL.  It is recognized and agreed by both parties that the Contractor Workers are not employees of DHL and are not entitled to participate in or receive any benefits or rights as employees of DHL, under any employee benefit and welfare plan, including, any employee insurance, pension, savings, or security plan. . .

AF 13.  Additionally, the Cartage Agreement provided a non-exclusivity clause with express limitations, which allowed Territory Reps to contract and conduct business with other companies:

> <u>Non-Exclusive Arrangement</u>.  Nothing in this Agreement shall prevent Contractor from performing any cartage or related services for any other person or entity, nor prevent DHL from engaging any other person or entity to provide cartage or related services (whether in the Service Areas or otherwise); provided, however, that in no event shall Contractor (a) provide cartage or related services to DHL's direct competitors in regional or nationwide express transportation without DHL's prior written authorization or (b) provide such cartage or related services to a third party in a manner that in any way violates the Trademark Usage Guidelines (including, for example, by having Contractor Workers perform such cartage or related services while

7

wearing a uniform with a DHL Mark or using a Contractor vehicle with a DHL Mark).

AF 14.   Although DHL was its sole client during the term of their contractual relationship, Territory Reps had contracted with at least three other companies since it was established in 1986.  AF 14.

Schedule D of the Cartage Agreement required that all Territory Reps employees wear DHL authorized identification badges stating "Employed by: Territory Reps, Inc., Independent Contractor for DHL Express."  AF. 16.  The delivery vehicles driven by Territory Reps employees also had the DHL logo and "Operated by Territory Reps, Inc." on both the driver and passenger side doors.  AF 18.

Territory Reps was solely responsible for hiring its workforce, making work assignments, and employee discipline.  AF 22, 27, 28.  DHL required Territory Reps driver applicants to submit to background, drug, and alcohol screening.  AAF 40. DHL paid for the background screening.  AAF 44.  DHL never had any input into rates of pay, method of payment, or frequency of payment; these decision were in Territory Reps' exclusive control.  AF 32.  Territory Reps was exclusively responsible for processing payroll for its employees.  AF 34.

Territory Reps and DHL negotiated for a payment per vehicle based on the

8

number of vehicles Territory Reps used to service its contract. (Doc. 71-15 at 128-29). Territory Reps was responsible for procuring, operating, maintaining, titling, insuring, fueling, and bearing all other costs associated with the fleet of vehicles used to provide services to DHL. AF 43. During times of extreme fuel prices, DHL paid Territory Reps a fuel surcharge. (Doc. 71-2 at 96-97).

DHL and Territory Reps contracted so that Territory Reps had "reasonable use" of the Birmingham facility out of which DHL operated. AF 19. Territory Reps paid a below-market fee for use of an office within the facility. AAF 55. Territory Reps leased handheld scanning devices from DHL on a month-to-month basis. AF 20. DHL provided Territory Reps with logoed uniforms at no cost to Territory Reps. AF 46. DHL provided all office supplies. AAF 56.

Each morning, DHL packages arrived at the Birmingham warehouse, where they were coded and placed by DHL on the DHL conveyer belt. AAF 15. Sorting of the packages could not begin until DHL gave the go-ahead once all packages had been off-loaded for the warehouse, coded, and put on the conveyor belt. AAF 17. The drivers then took those packages off the conveyor belt that, based on the delivery address, corresponded to that driver's assigned route, and scanned each package bar-code with the leased DHL scanners. AAF 18. Before the drivers started their delivery routes, a DHL employee monitored compliance with the Cartage Agreement

9

by observing the sorting and loading of packages and also performed uniform and truck audits each morning.  AAF 22.

Once the drivers were out on delivery, DHL could communicate with the drivers via the leased DHL scanners.  AAF 24.  These communications concerned customer complaints, inquiries, requests, or re-deliveries. AAF 24, 29. DHL required the drivers to deliver the packages by a specific time of day - 10:30 a.m., 12:00 p.m., 3:00 p.m., or 5:00 p.m. - depending on how the package was coded.  AAF 23. Drivers were not permitted to return to the warehouses until after the cut-off time for customer pick-ups had expired.  AAF 28.  This time varied between the drivers. (Doc. 89-12 at ¶ 10; Doc. 89-11 at ¶ 10).  Drivers usually were delivering packages long after the cut-off anyway, but even if their deliveries were finished, they could not leave their route.  (Doc. 89-12 at ¶ 10).

Once the drivers returned to the warehouse at the end of the day, DHL required the drivers to unload their vehicles and place certain packages on the DHL conveyor belt or give them to a DHL employee.  AAF 32.  Before leaving, the drivers were required to place their leased DHL scanners in a DHL-issued cradle so that the scanner could recharge overnight at DHL's expense.  AAF 33.  The cradled DHL scanner would then communicate all delivery and pick-up information from that day's activity to a DHL computer.  AAF 34.  The data from the scanners was used to

10

generate daily performance reports.  AAF 35.  DHL met with Territory Reps management on at least a bi-weekly basis to discuss the drivers' performance as reflected in the reports.  AAF 36.  Territory Reps management held morning meetings with the drivers on a daily basis to discuss issues concerning delivery problems from the day before as well as customer complaints which Territory Reps learned from DHL.  AAF 37.  These meetings were often attended by DHL employees.  AAF 38.

## IV.   ANALYSIS

### A.   Motion to Strike

In support of their response to DHL's Amended Motion for Summary Judgment, Plaintiffs submit the declarations of five Plaintiffs and one dismissed former Plaintiff.  (Docs. 89-7, 89-8, 89-9, 89-10, 89-11, 89-12).  DHL argues that the dismissed former Plaintiff's declaration should be struck in its entirety and that portions of all of the declarations should be struck because they contradict previous testimony, assert hearsay statements for the truth of the matter asserted and/or provide testimony on subject matters of which Plaintiffs have no personal knowledge.  (Doc. 100 at 1-2).  The declarations are identical for all relevant purposes and the Court shall address them in unison.[4]

_____

[4]  Beginning with paragraph 12a of Plaintiff DeShaun Oliver's declaration, the paragraph numbers do not correspond with the other Plaintiffs' declarations. In Plaintiff Oliver's declaration, the contents of paragraph 12a includes the

11

A declaration submitted in connection with a motion for summary judgment is subject to a timely motion to strike if it does not measure up to the standards of Federal Rule of Civil Procedure 56(e). *Auto Drive-Away Co. v. Interstate Commerce Comm'n*, 360 F.2d 446, 448 (5th Cir. 1966).[5]  An affidavit or declaration used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out the facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).  The Eleventh Circuit has held that "a district court may consider a hearsay statement in passing on a motion for summary judgment only if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form[,]'" meaning that "the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose" such as under an exception to the hearsay rule. *Macuba v. DeBoer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999).

---

testimony included at paragraphs 12a and 13 of each of the other declarations. What can be found at paragraphs 14-16 of the other declarations is found at paragraphs 13-15 of Plaintiff Oliver's declaration.  Although the numbering of Plaintiff Oliver's declaration does not coincide with the other declarations, the content is identical for all relevant purposes.

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding all Fifth Circuit decisions prior to the close of business on September 30, 1981.

Additionally, the Eleventh Circuit has explained that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). "When this occurs, the court may disregard the affidavit as a sham." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987). This rule is applied "sparingly because of the harsh effect this rule may have on a party's case." *Id.* The court must find that the affidavit and deposition contain an "inherent inconsistency" before the court can disregard the affidavit. *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1316 (11th Cir. 2007).

When a declaration submitted in connection with a motion for summary judgment contains inadmissible evidence, the court shall strike the inadmissible portions of the declaration and consider the rest. *See Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir. 1980).

## 1.    Dexter Ford's Declaration

DHL argues that former Plaintiff Ford's declaration should be struck in its entirety due to his failure to participate in discovery. (Doc. 100 at 3). On October 7, 2010, this Court dismissed Ford pursuant to Federal Rule of Civil Procedure 41(b)

13

due to his failure to participate in two properly noticed depositions.  (Doc. 65).

Plaintiffs argue that if DHL objects to the declaration because it was unable to depose

Ford, DHL's proper remedy is to file an opposing declaration.  (Doc. 104 at 15).

Plaintiffs also argue that Ford's declaration is admissible for purposes of rebuttal.  *Id*.

Declarations are admissible at the summary judgment stage when the declarant

was under oath and testified about matters on which he had personal knowledge.

FED. R. CIV. P. 56(c)(4).  Rule 56 does not require that a declarant be subject to cross-

examination.  *See Vondriska v. Cugno*, 368 Fed. Appx. 7, 8-9 (11th Cir. 2010)

(holding that depositions could be treated as affidavits under Rule 56(e), even those

taken without notice to or the presence of the later non-moving party on summary

judgment, to the extent the testimony was competent, on personal knowledge, and set

out facts admissible at trial).  However, some courts have held that "it is unreasonable

to rely on affidavit 'evidence' from an individual who has made himself unavailable

for discovery" pursuant to Federal Rule of Civil Procedure 37(d).  *Dedvukaj v.*

*Equilon Enters., L.L.C.*, 301 F. Supp. 2d 664, 668 (E.D. Mich. 2004) (striking

affidavit offered in response to motion for summary judgment, where affiant failed

to appear at deposition scheduled by defendant during discovery); *see United States*

*v. Hansen*, 277 Fed. Appx. 692, 693 (9th Cir. 2008) (holding that district court did

not abuse its discretion by striking defendant's affidavit in opposition to summary

judgment because defendant refused to testify about the subject matter of the affidavit at his deposition and failed to appear at a subsequent deposition); *Danjanovich v. Robbins*, No. 2:04-CV-623 TS, 2006 U.S. Dist. LEXIS 21295, at *9 (D. Utah Mar. 27, 2006) (striking affidavit of named defendant offered in support of motion to dismiss where defendant failed to attend his deposition).  As Ford was not a party to this case on March 13, 2011, the date he made his declaration, his declaration cannot be struck pursuant to Rule 37(d), which only addresses a party's failure to attend its own deposition.   Therefore, DHL's Motion to Strike with respect to Ford's declaration is due to be denied.

> **2.** **Objections Based on Lack of Personal Knowledge and Conflicting Testimony**

In its Motion to Strike, DHL objects to several portions of the declarations on the basis that the declarants lack personal knowledge as to the matters referenced therein and also due to argued inherent inconsistencies with the declarants' deposition testimony. (Doc. 100 at 5-9).  However, because Ford's declaration is identical in all relevant aspects except with respect to subparagraph (e) of Paragraph 7 to the current Plaintiffs' depositions, the objections to these portions of the declarations, excepting subparagraph (e), are due to be denied as moot.

In Ford's declaration, subparagraph (e) of Paragraph 7 is left intentionally

blank.  (Doc. 89-9 at ¶ 7(e)).  Paragraph 7(e) of the current Plaintiffs' declarations

reads:

> Each day before I left and the other drivers left the Birmingham
> warehouse to begin our deliveries, DHL employees spoke to the drivers,
> including myself, about various issues.  I know that DHL spoke to the
> other drivers about these issues because I observed it.  These issues
> included the following[:]
>
> . . .
>
> (e)    DHL employees also directed drivers to remove objects
>         from the interior of their van that the DHL employee felt
>         should [not] be in the van, such as objects hanging from the
>         rear-view mirror.[6]

(Doc. 89-12 at ¶ 7(e)).  DHL asserts that subparagraph (e) of Paragraph 7 should be

struck on the grounds that it is outside Plaintiffs' personal knowledge.  (Doc. 100 at

13).  DHL argues that Plaintiffs had no personal knowledge and are not competent

to testify as to how it was determined what should or should not be present in the

delivery vehicles, and, therefore, this Court should strike subparagraph (e).  *Id*.  DHL

states that this procedure was governed by the Cartage Agreement, of which the

declarants claimed to have no knowledge.  *Id.* at 13 n.6.  Thus, DHL argues, Plaintiffs

cannot testify as to who would have required the purported acts because they lacked

personal knowledge as to who was the decision-maker.  (Doc. 105 at 9).  Plaintiffs

---

[6] The challenged portions of the declarations have been underlined by the
court.

16

assert that they heard DHL employees tell them what objects should or should not

remain

in their vans and, therefore, their testimony is based on personal knowledge.  (Doc.

104 at 13).  The Court finds Plaintiffs' argument compelling and, therefore, DHL's

Motion to Strike with respect to subparagraph (e) of Paragraph 7 is due to be denied.

### 3.      Objections Based on Hearsay[7]

DHL argues that portions of Paragraphs 8, 9, 10, 11, 12, 14 and 15 should be

struck on the grounds that this testimony is based entirely on inadmissible hearsay.

(Doc. 100 at 16, 18, 19, 21, 23, 24).  The statements challenged by DHL were made

by other delivery drivers, Territory Reps management and employees, and DHL

employees.   Plaintiffs argue that these portions of the declaration constitute

admissions by a party opponent and, therefore, DHL's motion should be denied.

(Doc. 104 at 11).

Pursuant to Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay

---

[7]  In their initial Motion, DHL argued that subparagraphs  (f) and (g) of
Paragraph 7 contain inadmissible hearsay.  (Doc. 100 at 14).  However, in its
reply, DHL states that it mistakenly identified subparagraphs (f) and (g) as
inadmissible hearsay and that instead they should be struck on the basis of lack of
personal knowledge.  (Doc. 105 at 8).  The court will not permit DHL to change,
in its reply brief, its basis for objecting to these paragraphs.  Therefore, the court
has analyzed DHL's objections as originally stated and responded to by Plaintiffs.

if the statement is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  DHL does not address whether these statements constitute party opponent admissions in its reply.  The Court finds that the statements may be admissible pursuant to Rule 801(d)(2)(D), and, in light of DHL's failure to address the hearsay exception asserted by Plaintiffs, DHL's Motion to Strike these paragraphs is due to be denied.

## B.    Joint Employment

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d).  The well developed principle of joint employment is present "where a single individual stands in the relation of an employee to two or more persons at the same time[.]" *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1208 (11th Cir. 2003). "[J]oint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the FLSA[.]" 29 C.F.R. § 791.2(a).

In the context of the FLSA, the Code of Regulations establishes three circumstances in which a joint employment situation may arise:

> (b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally

18

will be considered to exist in situations such as:

>    (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
>    (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
>    (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly, or indirectly by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b).  The Eleventh Circuit has adopted the "economic realities" test for determining whether a joint employment relationship exists.  *Aimable v. Long & Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994).  The economic realities test lists eight factors to consider in determining whether an entity is a joint employer: (1) the nature and degree of the alleged employer's right to control the employees; (2) the degree of the alleged employer's supervision, direct or indirect, of the employees' work; (3) the alleged employer's right, directly or indirectly, to hire, fire, or modify the employees' working conditions; (4) the alleged employer's power to determine the employees' pay rates or methods of payment; (5) the alleged employer's preparation of payroll and payment of the employees' wages; (6) the alleged employer's ownership of the facilities where the work occurred; (7) the employees' performance

19

of a line-job integral to the alleged employer's business; and (8) the alleged employer's relative investment in equipment and facilities. *Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996). No one factor is determinative; the weight of each factor depends on the light it sheds on the employees' economic dependence, or lack thereof, on the alleged employer. *Id.* at 932-33. "Congress expressly rejected the common-law definition of employment, which is based on limiting concepts of control and supervision." *Id.* at 929. "Nor does it matter that the parties had no intention of creating an employment relationship, for application of the FLSA does not turn on subjective intent." *Brennan v. Partida*, 492 F.2d 707, 709 (5th Cir. 1974). Because the FLSA is a remedial statute, the Court must construe it broadly. *Id.* at 933.

### 1.      Nature and Degree of Control

The first factor to consider is the nature and degree of DHL's control over the Territory Reps drivers. "Such control arises when [the alleged employer] determines, for example, the number of workers hired for a job, when work should begin on a particular day, which workers should be assigned to specific tasks, and whether a worker should be disciplined or retained." *Id.* at 933; *see Aimable*, 20 F.3d at 441 (stating that control arises when the alleged employer goes beyond general instructions and "begins to assign specific tasks, to assign specific workers, or to take

an overly active role in the oversight of the work.").

Plaintiffs contend that DHL did, in fact, control Plaintiffs' work schedules. (Doc. 90 at 62).  Plaintiffs assert that DHL controlled the time when Plaintiffs started in the morning because DHL controlled when the packages arrived at its warehouse. (Doc. 90 at 62).  Plaintiffs also state that DHL controlled what time the Plaintiffs stopped working in the evening by requiring them, even if all deliveries were complete, to stay in their trucks until the deadline for pick-ups from DHL's drop-boxes had passed.[8]  (Doc. 90 at 62).

Although Plaintiffs could not begin sorting packages and loading trucks until DHL had delivered, sorted, and placed the packages on the conveyor belt in the warehouse, such actions did not necessarily signal the beginning of Plaintiffs' work day .  In addition to sorting and loading trucks, Plaintiffs' mornings also consisted of a meeting with Territory Reps management.  Coley testified that while Plaintiffs had to log into their route before scanning any packages, this action had nothing to do with their start time.  (Doc. 89-2 at 137).  Likewise, the Court finds that DHL did not control the time that Plaintiffs stopped working in the evening.  While drivers were

---

[8]  Plaintiffs also argue that the fact that DHL required them to participate in truck audits and directly communicated with Plaintiffs to require re-deliveries and pick-ups evidences that DHL controlled Plaintiffs.  (Doc. 90 at 62).  The Court finds that these factors are more appropriately addressed under the second factor, the degree of DHL's supervision of Plaintiffs.

not allowed to return to the warehouse until the cut-off time for customer pick-ups had expired, drivers usually worked past this time because they still had deliveries to make. The cut-off times varied for each driver based on the route assigned to them by Territory Reps.  Territory Reps was solely responsible for work assignments. Thus, the Court finds that this factor does not favor a finding of joint employment.

### 2.    Degree of Supervision

The second factor to consider, the degree of the alleged employer's supervision or the employees, "was developed in large part to assign responsibility to businesses which did <u>not</u> directly supervise the activities of the putative employees." *Antenor*, 88 F.3d at 934.  "[I]t is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor." *Martinez-Mendoza*, 340 F.3d at 1211 (quoting *Charles v. Burton*, 169 F.3d 1322, 1330 (11th Cir. 1999)).  "[I]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Martinez-Mendoza*, 340 F.3d at 1211.

Plaintiffs contend that DHL managers directly supervised and regularly criticized how Plaintiffs loaded their trucks and wore their uniforms. (Doc. 90 at 62-63).  Plaintiffs also point to the fact that DHL directly communicated with Plaintiffs to supervise re-deliveries and pick-ups and to require corrective action in response to customer complaints. (Doc. 90 at 63).

22

In *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1160 (C.D. Cal. 2003), *cited in Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1256 (11th Cir. 2004), the district court found that the presence of a quality control manager of the putative joint employer at the contractor's worksite whose job was to deal with quality control problems as they arose did not demonstrate the putative employer's control or supervision over the contractor's employees.  The court focused on the fact that the contractor maintained its own supervisors who were primarily responsible for the day-to-day management of its employees in that they scheduled work shifts, hours of work, and made employee assignments.  *Id*.  Similarly, DHL's supervision of Plaintiffs was in relation to their compliance with the standards set forth in the Cartage Agreement.  DHL did not assign Plaintiffs their work shifts or their routes nor did DHL ever discipline Plaintiffs.  Territory Reps was solely responsible for all these actions.  Although DHL exerted some overview over the drivers, the Court finds that this supervision was in the nature of quality control and did not rise to the level of action necessary to demonstrate supervision in the context of joint employment. *Id.*; *see also Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782, 783 (11th Cir. 2006) (per curiam) (holding plaintiff was an independent contractor and not an employee of defendant where defendant's interest in plaintiff's work was the end result of customer satisfaction and not with day-to-day regulation of his work habits,

23

hours worked, or work methods); *Singh v. 7-Eleven, Inc.*, No. C-05-04534 RMW, 2007 U.S. Dist. LEXIS 16677, at \*16 (N.D. Cal. Mar. 8, 2007) (finding putative employer's field representative's inspection of employees' uniforms for compliance with franchise agreement did not raise a material fact regarding putative employer's control of the workplace or conditions of employment). Therefore, the Court finds that this factor does not support a finding of joint employment.

### 3.     Right to Hire, Fire, of Modify Employment Conditions

In evaluating this factor, in addition to hiring and firing decisions, courts have analyzed a putative joint employer's ability to (1) veto hiring decisions, (2) dictate work hours, and (3) reassign tasks. *See generally Aimable*, 20 F.3d at 442; *Antenor*, 88 F.3d at 935. Notably, even where "a major client can pressure an employer into firing a particular individual," that power "does not transmute that client into that individual's employer." *Morrison*, 383 F.3d at 1255.

Plaintiffs assert that DHL had the right, power, and authority to modify their working conditions by dictating the hours Plaintiffs worked. (Doc. 90 at 63). Additionally the Plaintiffs contend that DHL modified Plaintiffs' employment conditions by requiring them to work until the passage of the pick-up times in the DHL drop boxes, even when Plaintiffs had completed their deliveries. (Doc. 90 at 64). Plaintiffs also state that DHL controlled who would be hired by conditioning

24

Territory Reps' pool of eligible employees on the terms DHL dictated in the Cartage Agreement.  (Doc. 90 at 63).

The express terms of the Cartage Agreement gave Territory Reps control over the hiring, firing, and modification of their employees' working conditions.  AF 13. The background checks and drug and alcohol screenings are checks on quality control and not actual authority over hiring; Territory Reps could hire any applicant who met these standards but was also free to fire any employee, even employees meeting those standards.  *See Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690-91 (D. Md. 2010) (holding that defendant was not liable as technicians' joint employer under the FLSA although defendant required technicians to pass criminal background check and drug test) .

DHL did not allow Plaintiffs to return to the warehouse until the cut-off time for customer pick-ups had expired, a specific time of day which differed for each Plaintiff.  Plaintiffs usually worked past this time because they still had deliveries to make, but they were not allowed to return to the warehouse before this time, even if they had finished their deliveries.  The Court does not find this to be a sufficient modification so as to evidence joint employment; DHL did not require Plaintiffss to work specific shifts, only to work to the same specified cut-off point to (or beyond) which they typically worked anyway, despite DHL's requirement.

25

### 4.     Pay Rates and Methods of Payment

Plaintiffs concede that there is no evidence that DHL determined Plaintiffs' pay rates or method of payments and that this factor does not favor a finding of joint employment.  (Doc. 90 at 63).

### 5.     Preparation of Payroll and Payment of Wages

Plaintiffs also concede that this factor does not favor a finding of joint employment for purposes of summary judgment.  (Doc. 90 at 64).

### 6.     Ownership of Work Facilities

"This factor is probative of joint employment because without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." *Martinez-Mendoza*, 340 F.3d at 1214.  In *Morrison v. Magic Carpet Aviation*, the Eleventh Circuit applied the multi-factor test to a Family Medical Leave Act case to evaluate a joint employment relationship between one of the defendants and the plaintiff-pilot.  The court determined that the plaintiff-pilot's work premises was the Boeing airplane he flew. *Morrison*, 340 F.3d at 1255.

The parties agree that the overwhelming majority of Plaintiffs' time was spent in their delivery vehicles, and, therefore, Plaintiffs' work premises were their delivery

vehicles.  (Doc. 71 at 72; doc. 90 at 53).  Territory Reps was responsible for operating, maintaining, titling, insuring, fueling, and bearing all other costs associated with these vehicles.[9]  Despite the display of the DHL logo on the vehicles, the Court finds that it is clear that Territory Reps owned the work premises, particularly in light of the fact that the logo was accompanied by the statement "Operated by Territory Reps, Inc."  Thus, the Court finds that this factor does not favor a finding of joint employment.

### 7.    Performance of a Specialty Job Integral to the Business

An employee who performs a routine task that is a normal and integral phase of the putative employer's business is likely to depend on the putative employer's overall enterprise and, therefore, may be probative of joint employment.  *Martinez-Mendoza*, 340 F.3d at 1213.  A task is considered integral to an employer's business when that employer "would be virtually certain to assure that the function is performed, and would obtain the services of whatever workers are needed for this function.  Accordingly, the workers so engaged can reasonably anticipate that the

---

[9]  Plaintiffs assert that DHL paid all costs, via the per vehicle fee, associated with the delivery vehicles' daily operations and maintenance, including the vehicles' insurance.  (Doc. 90 at 54).  However, the deposition testimony cited by Plaintiffs does not support their assertion.  In fact, in deposition testimony cited by Plaintiffs, Bill Talon, a DHL employee, testified that, in making the payment per vehicle, DHL did not intend for the contractor to bear no expense in operating the vehicle.  (Doc. 89-6 at 94-95).

work will be available for so long as the function in question must be performed."
*Id.* (quoting Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg.
at 11,741).

DHL acknowledges that the pick-up and delivery of packages to and from
DHL's customers is integral to DHL's business. (Doc. 102 at 26). However, DHL
argues that while the services provided by the drivers were integral, Territory Reps
and its employees were never integral to DHL's business because, at all times
material here, DHL engaged two other independent contractors who operated in and
around Birmingham, Alabama. *Id.* Plaintiffs argue that their job or delivering and
picking up packages was a part of a series of interdependent steps crucial to DHL's
overall business. (Doc. 90 at 68). Like Judge Acker in the *Layton v. DHL Express
(USA), Inc.*, this Court is unsure as to whether this factor should be viewed in a literal
fashion beneficial to Plaintiffs or in a "big picture" fashion beneficial to DHL.[10] No.
2:08-cv-1542-WMA (Doc. 135 at 18) (N.D. Ala. Jan. 12, 2011). It is certain that,

---

[10] In *Layton v. DHL Express (USA), Inc.*, employees of Sky Land Express,
Inc. ("Sky Land") asserted FLSA claims against DHL for unpaid overtime wages
as a joint employer. No. 2:08-cv-1542-WMA (Doc. 135 at 1) (N.D. Ala. Jan. 12,
2011). Sky Land, like Territory Reps, contracted with DHL to deliver and pick-up
DHL packages. *Id.* at 2. Sky Land operated out of the same Birmingham
warehouse location as Territory Reps. *Id.* It appears that the agreement that Sky
Land operated under was identical in all relevant aspects to the Cartage Agreement
between DHL and Territory Reps.

under the facts of this case, this factor can reasonably be viewed in either of those two ways.  Therefore, the court will exclude this factor from its analysis.

### 8.    Investment in Equipment and Facilities

Both DHL and Territory Reps have made significant investment in equipment and facilities.  DHL supplied the Birmingham facility to Territory Reps in addition to items such as the handheld scanners.  However, the delivery vehicles were owned, leased, or rented by Territory Reps.  Under similar facts, the Eleventh Circuit has found this factor to be irrelevant to their analysis or, alternatively, equally capable of being viewed as favorable to either side, and therefore excluded it from their analysis. *Aimable*, 20 F.3d at 443.

### 9.    Other Indicators

The Eleventh Circuit relies on these eight factors, but there are other indicators that have been used from time to time.  These additional factors have carried little weight in the Eleventh Circuit, but it has not held them inadmissible evidence. *See Aimable*, 20 F.3d at 443-44.

### i. Permanence of the Relationship

"Where [a contractor] and its workers are engaged for the duration of the operation and are obligated to work exclusively for the employer at its discretion, this factor would suggest economic dependence[,]" and, therefore, joint employment.

29

*Martinez-Mendoza*, 340 F.3d at 1212.  The relationship between DHL and Territory Reps was not exclusive and the Cartage Agreements were only for one year and were terminable at will by either party.  Although Territory Reps chose not to work with other clients, it retained the option to do so.  Further, DHL engaged other companies to perform the same tasks as Territory Reps performed.  Thus, the Court finds that this factor does not favor a finding of joint employment.

### ii.  Degree of Skill Required

The degree of skill required to perform the job has been considered by the Eleventh Circuit as a  factor, as part of the joint employer analysis.  *See Martinez-Mendoza*, 340 F.3d at 1212.  "[T]he lower the worker's skill level, the lower the value and marketability of his services, and the greater the likelihood of his economic dependence on the person utilizing those services."

Plaintiffs contend that the most challenging aspect of their job was using the handheld leased DHL scanner, "which a 12 year-old could operate."  (Doc. 90 at 67).  DHL asserts that much skill is required in order to be a successful delivery courier and that the marketability of these skills is demonstrated by the utilization by two of the Plaintiffs of their skills as courier drivers in their current employment.  (Doc. 102 at 28).

At this juncture, the Court is not prepared to decide whether a person's job

30

requires skill.   However, like the Eleventh Circuit, the Court has "difficulty discerning the probative value of this factor in resolving, one way or the other, the issue of joint employment." *Martinez-Mendoza*, 240 F.3d at 1213 n.33.   Though this factor may demonstrate slight economic dependence, the Court finds it without significant weight in light of its analysis of the other factors.

### iii.  Opportunity for Profit and Loss

This factor asks "whether, through their own initiative or managerial skill, [Plaintiffs] had the opportunity of realizing profit." *Aimable*, 20 F.3d at 443.   This factor does not assist the Court's analysis; it "is used to determine whether an individual is an independent contractor or an employee." *Id.*   Although this factor would indicate that Plaintiffs were not independent contractors, it would not assist the Court in determining whether DHL was Plaintiffs' joint employer.   Thus, this factor is irrelevant to the Court's analysis.

In summation, this Court finds, as did Judge Acker in *Layton*, that DHL did everything it could possibly do to relate to Territory Reps only as an "independent contractor." *Layton*, No. 2:08-cv-1542-WMA (Doc. 173 at 1) (N.D. Ala. May 5, 2011).   Although one factor of the economic realities test arguably points to joint employment, namely the performance of a speciality job integral to the business, as does another of the  factors the Eleventh Circuit considers, namely the degree of skill

required, the Court finds that these factors are insufficient in light of the Court's analysis of the remaining factors. The Cartage Agreement allowed DHL to exercise only the minimal supervision necessary to monitor compliance with the contract. The undisputed facts lead to the conclusion that Plaintiffs were employed by Territory Reps and not by DHL. Therefore, the claims against DHL are due to be dismissed. Having granted summary judgment to DHL on the basis that it was not Plaintiffs' employer, the Court will not address DHL's other grounds for dismissal.

## V.    CONCLUSION

Accordingly, for the reasons stated above, DHL's Amended Motion for Summary Judgment is due to be granted and DHL's Motion to Strike is due to be denied. DHL's Motion for Summary Judgment and Second Motion for Summary Judgment are due to be denied as moot. A separate order will be entered.

**DONE** and **ORDERED** this the 5th day of August, 2011.

**VIRGINIA EMERSON HOPKINS**
United States District Judge